IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JENIFER WATKINS, )
        Plaintiff, )
 )
v. ) Civil Action No. 07-0592
 )
THE VERLAND FOUNDATION, INC., )
        Defendant. )

MEMORANDUM and ORDER

Gary L. Lancaster                                                                    August 5, 2008
U.S. District Judge

     This is an action in employment discrimination. Plaintiff, Jenifer Watkins, alleges that defendant, The Verland Foundation, Inc., discriminated against her based on her age in violation of the Age Discrimination in Employment Act, 29 U.S.C. §621, et seq., and the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951 et seq.[1] Verland alleges that it terminated Watkins because she left the Verland campus, with her entire staff, when a disabled individual was scheduled to volunteer in the Equestrian Therapy stables. Watkins does not deny that the incident happened, and she takes full responsibility for it. However, she contends that her new supervisor, Anita Poplawski, misrepresented the facts surrounding the incident to her superiors so that Poplawski could engineer Watkins's firing.

---

[1] The same analysis applies to both the ADEA claim and the PHRA claim. Thus, the disposition of the PHRA claim follows from the disposition of the ADEA claim. Connors v. Chrysler Financial Corp., 160 F.3d 971, 972 (3d Cir. 1998).

Watkins claims that Poplawski's motivation for this scheme was Watkins's age.

Verland has filed a motion for summary judgment [doc. no. 15] arguing that Watkins is unable to establish that Verland's legitimate, non-discriminatory reason for terminating her is pretext for age discrimination. In response, Watkins contends that because Poplawski's credibility is in doubt the case must be submitted to a jury.

For the reasons that follow, we will grant Verland's motion for summary judgment.

I. FACTUAL BACKGROUND

All material facts discussed herein are undisputed unless otherwise indicated. Other facts may be discussed in the memorandum in context.

Verland operates long-term, residential facilities at which it cares for, treats, and educates children and adults who are mentally and/or physically disabled. Verland's campus includes an Equestrian Therapy program. The Equestrian Therapy program is comprised of a barn, stables, a horse-riding area, and paddocks on the Verland campus. It is enclosed by a fence and gate. At the time of the incident, several horses and donkeys were housed in the area.

Watkins started working for Verland in 1987 on a part-time basis as an equestrian therapy specialist. Shortly thereafter she was offered full-time employment. After several promotions, Watkins eventually obtained the position of Equestrian Therapy Manager. Watkins held that position from 1999 until she was terminated in 2006. Her job duties included supervising all staff involved in the Equestrian Therapy program, and establishing the rules and procedures for the stables. Watkins also recruited, trained, and coordinated volunteers for the Equestrian Therapy program.

David Brown was one of the Equestrian Therapy program volunteers. Mr. Brown has Spina Bifida and is confined to a wheelchair. He resides at the Spina Bifida Association of Western Pennsylvania (SBA). The SBA arranged for Mr. Brown to volunteer at the Verland stables due to his interest in horses. Mr. Brown had significant experience with horses when he began volunteering at the Verland stables. Mr. Brown brushed the horses and cleaned their stalls during his volunteer sessions. A Verland employee was present in the equestrian area each time Mr. Brown volunteered, until May 5, 2006.

Mr. Brown typically volunteered at the stables on Mondays, Wednesdays, and Fridays. However, during the week of May 1, 2006, Mr. Brown missed his Monday session due to a lack of

transportation from the SBA. He did attend his session on Wednesday, May 3, 2006, and was scheduled to volunteer on Friday, May 5, 2006. Watkins was on vacation Monday and Wednesday of that week. When she returned on Thursday, May 4, 2006, she was told by the Equestrian Therapy Aide, Joe Edwards, that Mr. Brown had missed both his Monday and Wednesday volunteer sessions, and had failed to call to cancel either of them. Based on this information, Watkins assumed that Mr. Brown would not attend his Friday volunteer session.

On the assumption that Mr. Brown would not arrive for his afternoon volunteering session on May 5, 2006, Watkins decided to purchase supplies for the stables. Watkins borrowed a Verland van and left the Verland campus for several hours. She took the other two stable workers with her. Edwards was on vacation that day. The horses were out of their stalls, but contained within the Equestrian Therapy area by the fence and gate. No other Verland employee was working in the stables that day. Watkins did not notify any other Verland employee that a disabled individual was scheduled to volunteer that afternoon in the stables, nor did she call the SBA and confirm that Mr. Brown would not attend his volunteering session before leaving campus.

4

While Watkins and the other two stable workers were off-campus obtaining supplies, an SBA driver dropped Mr. Brown off at the stables for his volunteer session. Although some of the details regarding the incident are disputed, there is no dispute that when Mr. Brown arrived, there were no Verland employees in the equestrian area. It is also undisputed that Mr. Brown waited in the equestrian area for a Verland employee to arrive, and remaining unassisted, wheeled himself to the Verland offices. While wheeling himself to the offices, Mr. Brown fell out of his wheelchair, but was able to get back into the chair himself.

It is undisputed that Watkins had created a contingency plan with the SBA before Mr. Brown began to volunteer at the Verland stables. Under the plan, if the equestrian staff was not at the stables when Mr. Brown arrived, he was to call Watkins's office or Edwards's office from the barn phone. If neither of them could be reached by phone, Mr. Brown was to go to the offices to get one of them. However, on May 5, 2006, Mr. Brown could not execute the contingency plan because neither Watkins nor Edwards were on campus. It is undisputed that no contingency plan anticipated that Watkins would leave campus with all of her stable employees, while Edwards was on vacation, leaving the

5

equestrian area unattended when Mr. Brown was scheduled to volunteer.

Again, although the details are in dispute, the evidence reflects that upon arrival at the Verland offices on May 5, 2006, Mr. Brown spoke with Anita Poplawski. Poplawski learned that when Mr. Brown had arrived on Verland's campus there were no Verland employees at the stable, and that after some time, he had wheeled himself from the stables to the offices. Mr. Brown expressed concern to Poplawski about the fact that no one had been at the stables to meet him.

Poplawski informed Jessica McFarland of the SBA about the incident. On May 8, 2006, the Monday following the incident, McFarland sent an e-mail to Verland's President and Chief Executive Officer, Carol Mitchell, suspending Mr. Brown's volunteering arrangement with Verland. McFarland also expressed her concern with Mr. Brown being "at the barn by himself with the horses roaming" and having "to push himself in his wheelchair up the driveway, open the gate without the horses getting out and close it behind him."

That same day, Verland's Human Resources Manager, Thomas Schmura, left a voice mail message on Watkins's cell phone informing her that she was suspended pending investigation of the May 5th incident. Later that same day, Poplawski and Schmura

6

participated in a telephone conference with Watkins. During that call, which lasted ten minutes, Watkins apologized and took full responsibility for the incident, and offered to call Mr. Brown personally to apologize.

Thereafter, Poplawski and Schmura recommended to Mitchell that Watkins be terminated. Verland sent a letter dated May 11, 2006 to Watkins informing her that her employment would be terminated effective May 12, 2006. The reason for the termination was "gross negligence that resulted in a disabled client, a wheelchair user, from an outside agency who volunteers several days a week in the Equestrian Therapy program, being left unattended at the [Verland] barn for over 2-1/2 hours." Watkins was informed of the termination by telephone on May 11, 2006.

## II. STANDARD OF REVIEW

Fed.R.Civ.P. 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." To defeat summary judgment, the non-moving party cannot rest on the pleadings, but rather must go beyond the pleadings

and present "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

The mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. A dispute over those facts that might affect the outcome of the suit under the governing substantive law, i.e., the material facts, however, will preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Similarly, summary judgment is improper so long as the dispute over the material facts is genuine. Id. In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party. Id. at 248-49. Under these standards, the non-moving party must do more than show there is "some metaphysical doubt" as to the material facts. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

Although inferences must be drawn in favor of the non-moving party, "an inference based upon speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n.12 (3d Cir. 1990). Similarly, the non-moving

party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)); see also Lujan v. National Wildlife Fed., 497 U.S. 871, 888 (1990) ("The object of [Rule 56(e)] is not to replace conclusory allegations of the complaint ... with conclusory allegations of an affidavit").

The non-moving party has the burden of producing evidence to establish each element of her claim. Celotex, 477 U.S. at 322-23. The non-movant must show more than "[t]he mere existence of a scintilla of evidence" for elements on which she bears the burden of production. Anderson, 477 U.S. at 252. Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec., 475 U.S. at 587 (citations omitted).

In summary, the inquiry under a Rule 56 motion is whether the evidence of record presents a genuine dispute over material facts so as to require submission of the matter to a jury for resolution of that factual dispute or whether the evidence is so one-sided that the movant must prevail as a matter of law because no reasonable jury could return a verdict in her

9

favor. It is on this standard that the court has reviewed defendant's motion and plaintiff's response thereto.

III. DISCUSSION

Verland contends that it fired Watkins because she left campus with her staff, leaving the equestrian area unattended, when Mr. Brown, a wheelchair bound individual from the SBA, was scheduled to volunteer. Once a defendant has articulated a legitimate non-discriminatory reason for its employment action, to defeat summary judgment a plaintiff must produce evidence from which a fact finder could either disbelieve the employer's articulated reason, or believe that a discriminatory reason was more likely than not the cause of the employment action. Salley v. Circuit City Stores, Inc., 160 F.3d 977, 981 (3d Cir. 1998) (citing Olsen v. General Elec. Astrospace, 101 F.3d 947, 951 (3d Cir. 1996)). Here, Watkins does not deny that the May 5, 2006 incident occurred. She accepts full responsibility for it. However, she claims both that a reasonable jury could disbelieve that the incident was the real reason that she was fired, and that a reasonable jury could find that her age was more likely than not the reason that she was fired. Upon review of the record, we find that Watkins cannot defeat summary judgment on either basis.

10

To discredit the employer's articulated reason for an employment decision, plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994). Rather, the plaintiff must point to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons such that a reasonable fact finder could rationally find them 'unworthy of credence.'" Simpson v. Kay Jewelers, 142 F.3d 639, 644 (3d Cir. 1998).

Watkins claims that there are contradictions and misrepresentations in Poplawski's testimony, such that a reasonable juror could question her credibility, and, as a result, disbelieve Verland's legitimate non-discriminatory reason for firing her. However, Watkins's attempts to discredit Poplawski fall short on at least two grounds.

First, although presented in a compelling manner in her brief, the record evidence itself does not always support Watkins's attacks. A few examples illustrate the point.

For instance, Watkins claims that the May 5, 2006 incident was "not [] a 'major deal'" to the SBA, and that

11

Poplawski exaggerated the seriousness of it in order to get her fired. However, McFarland stated in her deposition that "[i]t's not that when [Mr. Brown] fell out [of his wheelchair], it wasn't a major deal, because it was a major deal." Furthermore, in an e-mail sent by McFarland to Mitchell the Monday after the incident, McFarland stated that she was "very concerned" and "very upset and sick to my stomach" about the incident. The SBA immediately suspended Mr. Brown's volunteering sessions with Verland via that e-mail. The fact that the SBA asked Verland to allow Mr. Brown to resume volunteering at some point in the future does not prove that the incident was not a serious matter to the SBA. The record evidence does not support Watkins's contention that Poplawski exaggerated how seriousness the incident was to the SBA so that the other decisionmakers would agree with her recommendation to fire Watkins.

Similarly, Watkins contends that Poplawski characterized Mr. Brown as a client, or resident, in order to engineer her firing. However, again, this attack on Poplawski is not supported by the record. The termination letter clearly identifies Mr. Brown as a man "from an outside agency who volunteers several days a week in the Equestrian Therapy program." There is no evidence that Poplawski lied about Mr. Brown's status in order to ensure that Watkins would be fired.

12

Schmura, Mitchell, and Poplawski all understood that Mr. Brown was a volunteer. However, even though Mr. Brown was not a Verland resident, Verland employees had an obligation to treat disabled individuals under its care properly. The Client Abuse Policy, which the decisionmakers consulted, reflected the level of care expected from Verland employees.

Regardless of whether or not that policy technically applied to Mr. Brown, there is no dispute that, as an employer, Verland could expect a certain level of care and competence from its employees. Leaving campus when a wheelchair bound individual was scheduled to volunteer, without cancelling the session or making arrangements for his expected, or even possible, arrival would violate any such standard. There is no evidence that Poplawski misrepresented Mr. Brown to be a resident of Verland to any of the other decisionmakers, or misrepresented the applicability of the Client Abuse Policy, in order to get Watkins fired. Watkins cannot satisfy her burden to discredit Verland's legitimate, non-discriminatory reason for her termination with attacks on Poplawski's credibility that are not supported by record evidence.

Nor can Watkins satisfy her burden by pointing out fabrications, disputes, and contradictions in Poplawski's

testimony that are inconsequential. Again, although there are many examples, a few will adequately illustrate the point.

For instance, Watkins claims that Poplawski's credibility is drawn into question, and her age bias revealed, because while Poplawski claimed that Mr. Brown's clothes were grass stained when he arrived at her office, another Verland employee denied seeing grass stains on his clothes. The contradiction is inconsequential. There is no dispute that Mr. Brown fell out of his wheelchair and that the SBA was concerned about that. Even if Poplawski fabricated the grass stains, Watkins was not fired because Mr. Brown had ruined a pair of pants. She was fired for leaving campus when Mr. Brown was scheduled to volunteer, without cancelling his session, or making arrangements for his potential arrival. Even if proven true, lying about the condition of Mr. Brown's pants does not prove that Poplawski misrepresented and manipulated the facts surrounding the incident in order to get Watkins fired due to her age.

Similarly, Watkins draws Poplawski's credibility into question because Poplawski claimed that Mr. Brown was "stuck" in the barn unable to reach the phone, when McFarland had seen Mr. Brown reach the phone in the barn in the past. Again, although perhaps another example of Poplawski's penchant for the dramatic,

14

the contradiction is irrelevant. There is no dispute that whether or not Mr. Brown could reach the phone to call Watkins or Edwards, neither was on campus for him to speak to. And there is no dispute that Watkins failed to notify anyone of Mr. Brown's possible arrival, or make arrangements for it, or cancel Mr. Brown's session, before she left campus. That was the reason for the termination. Again, the alleged contradiction in the evidence is inconsequential, and does not satisfy Watkins's burden to prove that Verland's legitimate, non-discriminatory reason for her termination is unworthy of belief.

Lastly, according to Watkins, Poplawski is not credible because she misrepresented the policies governing the stables. Poplawski claimed that volunteers were not allowed to be alone in the stables, when, in fact, Watkins said that they were. The dispute, however, is immaterial. Watkins was not fired for allowing Mr. Brown to work with the horses alone. She was fired for leaving campus, with all of her staff members, when Mr. Brown was scheduled to volunteer, without making any arrangements for his arrival. Whether or not Watkins would have otherwise allowed any volunteer, including Mr. Brown, to be in the stables without constant supervision is irrelevant. To have left campus, without cancelling the volunteering session, or arranging for Mr. Brown's arrival, was improper. Watkins herself admits that. She was

15

"appalled" when she discovered that Mr. Brown had been dropped off at the stables when no one from Verland was there.

The list of these types of insignificant, or illusory, alleged contradictions in the evidence could go on. However, none of these details were the basis for the decision to fire Watkins, and none could lead a reasonable juror to disbelieve Verland's asserted reason for firing Watkins. Watkins was fired because she left campus with all the stable employees when Mr. Brown was scheduled to volunteer. Watkins admits the essential facts surrounding that incident. Watkins admits her responsibility for the incident. Under the circumstances, Watkins cannot establish that Verland's legitimate, non-discriminatory reason for firing her is unworthy of belief by pointing out inconsistencies in one witness's testimony that are not material.

In sum, the attempted attack on Poplawski's credibility does not carry Watkins's burden to establish such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons such that a reasonable fact finder could rationally find them 'unworthy of credence.'" Simpson, 142 F.3d at 644; Fuentes, 32 F.3d at 765. Either the record evidence does not support the attack, or the inconsistency or contradiction, to the extent it

exists, is on a minor detail that had no effect on the decision to terminate Watkins.

Nor has Watkins presented any independent evidence that would lead a reasonable juror to believe that a discriminatory reason was more likely than not the reason for her termination. Watkins claims that Poplawski, the real decisionmaker, made several ageist remarks in her deposition, proving that Poplawski fired Watkins due to her age. Again, Watkins's attempts to prove that age was the real reason she was fired fall short on at least two grounds.

First, the deposition comments were made years after Watkins was fired. These temporally removed comments could not be the basis for a reasonable juror to find that Watkins was fired in 2006 because of her age.

Second, we do not consider the deposition comments to be probative of age discrimination. During her deposition, Poplawski indicated several times that Watkins felt that she did not have to follow rules and procedures at Verland. Sometimes Poplowski expressed her opinion that Watkins felt that she did not have to follow the rules because of her seniority. If Watkins refused to follow the rules for any reason, she was subject to termination. Older workers are not exempt from an employer's policies and procedures due to their seniority. No

reasonable juror could conclude that Poplawski fired Watkins due to her age based on these comments.

Poplawski's deposition comments cannot prove that Watkins's age was more likely than not the cause of her termination. The comments are both removed in time from the employment decision, and were being offered as a possible explanation for Watkins's misconduct at work.

As such, Watkins has failed to meet her burden to produce evidence from which a jury could either disbelieve Verland's reason for firing her, or believe that her age was more likely than not the real cause of her termination. <u>Salley</u>, 160 F.3d at 981. Accordingly, we must enter summary judgment in Verland's favor on both the ADEA and PHRA claims.

## IV. CONCLUSION

For the foregoing reasons, summary judgment will be entered in defendant's favor. An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JENIFER WATKINS,<br>      Plaintiff,<br><br>v.<br><br>THE VERLAND FOUNDATION, INC.,<br>      Defendant. | Civil Action No. 07-0592 |

## ORDER

AND NOW this 5th day of August, 2008, IT IS HEREBY ORDERED that defendant's motion for summary judgment [doc. no. 15] is GRANTED;

IT IS FURTHER ORDERED that defendant's motion for leave to file a reply brief [doc. no. 26] is DENIED.

Judgment shall be entered in defendant's favor.

The Clerk of Courts is directed to mark this matter as closed.

BY THE COURT,

_/s/ Lancaster_

cc: All Counsel of Record

19